## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| DANIEL ROBERT | * | |
| SSGT, U.S. ARMY | * | |
| | * | |
| HOLLIE MULVIHILL | * | |
| SSGT, USMC | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 1:21-cv-002228 |
| LLOYD AUSTIN | * | |
| Secretary of Defense, | * | |
| U.S. DEPARTMENT OF DEFENSE | * | |
| Washington, D.C. 20301 | * | |
| | * | |
| and | * | |
| | * | |
| XAVIER BECERRA | * | |
| Secretary of the U.S. Department of | * | |
| Health and Human Services | * | |
| U.S. DEPARTMENT OF HEALTH | * | |
| AND HUMAN SERVICES | * | |
| | * | |
| and | * | |
| | * | |
| JANET WOODCOCK, Acting | * | |
| Commissioner of the Food & Drug | * | |
| Administration | * | |
| U.S. FOOD AND | * | |
| DRUG ADMINISTRATION | * | |
| | * | |
| UNITED STATES OF AMERICA | * | |
| | * | |
| Defendants. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MOTION FOR PRELIMINARY INJUNCTION

Now come the Plaintiffs and hereby move this court for a preliminary injunction with

respect to all Defendants. In support of their motion, Plaintiffs aver and state as follows:

## INTRODUCTION

1.      Plaintiffs filed their first complaint in this matter on August 17, 2021, seeking, *inter alia*, declaratory and injunctive relief against Defendants. Plaintiffs' First Amended Complaint was docketed with the Court on October 6, 2021, against the same Defendants and seeking the same relief.

2.      The facts and allegations stated in Plaintiffs' Amended Complaint are hereby incorporated into and made a part of this motion for preliminary injunction, as if fully set forth herein. Amended Complaint, Case No. 1:21-cv-002228, ECF No. 29[1]

3.      With the collaboration of the other Defendants, Defendant Department of Defense ("DoD") through the Secretary of Defense ("SECDEF") is currently engaged in an illegal vaccination program involving all active duty, National Guard, and reserve members of the all-volunteer force.

4.      In violation of 10 U.S.C. §1107, 10 U.S.C. §1107a, and 21 U.S.C. §360bbb-3, Defendant DoD is knowingly coercing and compelling service members to submit to inoculation with an Emergency Use Authorization (EUA) vaccine for COVID-19. There has been no attack, threat, operation, or declared military exigency in a particular theater to justify the use of unapproved biologic products on the entire U.S. military, whose members are stationed in disparate areas throughout the United States. Some states are explicitly no longer in a public health crisis or pandemic.[2] This is a transparent attempt to impose an unlawful, unprecedented, nationwide public health mandate on one segment of the U.S. populace using the guise of

---

[1] Each citation to the Court's electronic record in this Motion refers to the ECF electronic docket for this case, unless otherwise specified.
[2] Kansas, Connecticut, Colorado, Florida, Washington, Minnesota, Wisconsin – just to name a few – are no longer in a declared emergency, by the authority of their governors and/or state legislatures. How the President has the authority to exercise federal "police powers" over those states' sovereignty, including their citizens, is also unclear under any law or doctrine.

military necessity where there is none.

5.      Without a preliminary injunction, Defendant DoD, aided and abetted by the other Defendants, will continue to violate the federal rights of service members, federal contractors, and others within its scope of control.

6.      Plaintiffs, who are service members facing immediate orders to submit to involuntary inoculation with unlicensed biologics, including Pfizer-BioNTech BNT162b2 ("Pfizer BNT") are properly before this court and likely to prevail in this case on the merits of their claims.

7.      Because Plaintiffs are subject to the command authority of their military superiors, and because these superiors are knowingly disregarding Plaintiffs' rights by systematically denying valid religious accommodation requests, denying presumptive medical exemptions, and ordering vaccination with unlicensed medical products, there is no adequate remedy at law to protect Plaintiffs' rights and interests.

8.      Accordingly injunctive relief is necessary to prevent irreparable harm to Plaintiffs and those similarly situated to them during the pendency of this action.

9.      This court has jurisdiction to grant a preliminary relief sought in this motion, pursuant to Fed.R.Civ.P. 65.

10.      Pursuant to D.C.Colo.LCivR 7.1, Plaintiffs' counsel has previously attempted to confer with counsel for Defendants; however, counsel for Defendants have failed to enter their appearance or engage in any discussion related to the instant motion.

## ANALYSIS

11.      The Tenth Circuit recognizes a four-factor test when determining whether a preliminary injunction is appropriate. A moving party must establish: (1) a substantial likelihood

the moving party will prevail on the merits; (2) that the moving party will suffer irreparable injury without such an injunction; (3) that the balance of interests weighs in favor of the moving party; and (4) that the injunction would not be adverse to public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980).

12.     If a moving party establishes that factors 2, 3, and 4 weigh in favor of the moving party, "the test is modified, and [the moving party] may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Soskin v. Reinertson*, 353 F.3d 1242, 1247 (10th Cir. 2004)(citing *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

**A.  Plaintiffs Are Properly Before This Court.**

13.     Civilian courts have traditionally been hesitant to intervene in the conduct of military affairs for obvious reasons. "The military is a specialized society separate from civilian society with laws and traditions of its own (developed) during its long history… To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975)(internal citations omitted). On the other hand, "'[O]ur citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes.' This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." *Chappell v. Wallace*, 462 U.S. 296, 304 (1983)(citing E. Warren, *The Bill of Rights and the Military*, 37 N.Y.U.L.Rev. 181, 188 (1962)). The contours of the judicial doctrine of non-interference have been slowly carved across a wide swath of litigation. While *Bivens*-type suits for money damages by service members

against their superiors have been excluded by *Feres v. United States*, 340 U.S. 135 (1950), federal district courts and appellate courts have entertained a wide array of constitutional challenges to military policies by the Department of Defense, under the same authority and rubric as Administrative Procedures Act claims against any of the other agencies that govern a significant portion of American citizens' lives. Indeed, there exist multiple district and appellate court precedents regarding precisely the type of claims presented here.

14.     In *Doe v. Rumsfeld,* 297 F. Supp. 2d 119 (D.D.C. 2003), the District Court for the District of Columbia analyzed a request for injunctive relief by active-duty service members and federal contractors opposed to being forced to take a vaccine to inoculate them against *aerosolized* anthrax. The vaccine had been licensed for mill workers to treat against *cutaneous* anthrax from handling animal hides, rather than from an aerosolized delivery as a biological weapon. This was an attempt by the same Defendants DOD and FDA to force members of the Armed forces to take a *licensed* biologic in an off-label (i.e. *investigational*) manner under the federal Food, Drug, and Cosmetic Act ("FDCA").

15.     In its opinion granting the injunction, the court first analyzed the basic issue of whether an Article III court could properly deal with a request to enjoin military orders. Noting that the D.C. Circuit had not adopted a blanket rule prohibiting service members from seeking injunctive relief against the military and civilian courts in all cases, the court examined three factors to determine the initial question of justiciability. *Doe*, 297 F.Supp. 2d, at 126.

16.     The three factors examined by the court are: whether a court martial was pending against any of the plaintiffs (*see, Schlesinger v. Councilman*, 420 U.S. 738 (1975)); the degree to which a ruling by the court would interfere with supervisory-subordinate relationships on the battlefield and/or personnel decisions (*see, Chappell*, 462 U.S. 296, 300); and the extent to which

court action would affect or disrupt the goals of discipline, obedience and uniformity (*see*, *Goldman v. Weinberger*, 475 U.S. 503 (1986)). *Id*.

17.     None of the Plaintiffs in the instant case are pending court-martial or are involved in current military justice or administrative personnel actions. "Thus, there are no concerns that this lawsuit [is] an attempt to interfere with pending court martial proceedings or that a judgment in this case will interfere with a pending court martial against one of the plaintiffs." *Doe*, 297 F.Supp.2d, at 128.

18.     As in *Doe*, this case alleges that both the DoD and FDA have (again) acted arbitrarily and capriciously by failing to adhere to statutes and regulations governing the exact same activity: an attempt to forcibly inoculate volunteer members of the Armed Forces with a biologic product that is either "unapproved for its applied use" (and subject to 10 U.S.C §1107) or under an Emergency Use Authorization (and subject to 10 U.S.C. §1107a).

19.     Plaintiffs make a claim against the Secretary of Defense for a decision made at headquarters, not about a tactical decision made by military supervisors in the field. A judgment by this court will not affect command relationships on a battlefield.

20.     Likewise, concerns about military uniformity, such as those present in *Goldman*, do not exist when the issue is vaccination status, something not perceivable by observers. *Doe*, 297 F. Supp.2d, at 128.

21.     "It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. The military departments enjoy no immunity from this proscription." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979)(citation omitted). Accordingly, this case presents a justiciable issue for this court.

22.     *Doe* also informs this case with respect to the Administrative Procedure Act's ("APA") limitation on the U.S. government's waiver of sovereign immunity. Specifically, the APA does not apply to "claims for which an adequate remedy is available elsewhere." *Id.*, citing *Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598, 607 (D.C.Cir. 1992). In *Doe*, The Department of Defense Defendant argued that the proper forum for plaintiffs to raise their vaccine claims was the military justice system after having refused orders to take the vaccine. The *Doe* court rejected the argument, noting that other courts had determined that a service member facing orders she believed to be illegal had the option of either obeying the orders and then seeking judicial review of the military's policies or disobeying the orders and challenging their validity in subsequent military disciplinary proceedings.

23.     While none of the Plaintiffs are facing disciplinary proceedings at this moment, they have already been ordered to take the first shots by Nov. 2, 2021. Given that there are no military court-martial proceedings under way, this Court may properly hear and act on their request for injunction.  *Doe*, 297 F. Supp.2d, at 129.

24.     Finally, the *Doe* court recognized that military service members facing an order to take an unlicensed product allege a definitive injury subject to remediation by the court. "[W]hen challenging an investigational drug under 10 U.S.C. §1107, an inoculation without informed consent or a presidential waiver is the injury.…  all plaintiffs have established they will imminently suffer a harm that is actual, concrete, and inflicted at the hands of the Defendants unless Defendants are required to conform to 10 U.S.C. 1107." *Doe*, 297 F.Supp.2d, at 131.

25.     Plaintiffs' allegations in the Amended Complaint establish that they are properly before this Court, and that the court has the authority and capacity to hear the case and enjoin Defendants' illegal conduct.

**B.  The Pfizer-BioNTech Shot (BNT) Is Not Licensed; Plaintiffs Therefore Have More Than a "Substantial Likelihood" of Success On The Merits Of Their Claim.**

26.     The merits argument of Plaintiffs' case regarding all members of the Armed Forces can be summarized succinctly: (1) Federal law prohibits anyone, including a member of the Armed Services, from being forced, coerced, or in any way pressured to be inoculated with an unlicensed biologic (IND or EUA, or both) without their informed consent; **and** (2) Defendants are ignoring that prohibition, as well as their explicit statutory responsibilities to ensure that the American public, and Plaintiffs as a class, know that they have the absolute right to refuse being administered an unlicensed biologic product.

27.     Defendant FDA extended the Emergency Use Authorization (EUA) for the Pfizer BNT shot[3] on August 23, 2021. (*See* Exh. 11, to Amended Complaint, ECF #29). That letter states in pertinent part:

> "On August 23, 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, <u>FDA is reissuing the August 12, 2021 letter of authorization in its entirety with revisions incorporated to clarify that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses</u>[.]"[4]

28.     This letter by Defendant FDA to Pfizer and BioNTech dated Aug. 23, 2021, also makes clear that there are scientific, manufacturing, and *legal differences* between the Pfizer-BioNTech COVID-19 (BNT) shot and the newly approved COMIRNATY COVID-19 Vaccine, mRNA. (*Id.*, p. 2-3 n. 8, 9). The most salient of the differences for this Court is that the Pfizer

---

[3] As noted in plaintiffs' complaint, the COVID-19 shots being administered are absolutely NOT "vaccines." A vaccine has for more than 200 years been considered to consist of isolating and using some version of the virus to be protected against – live or attenuated – and that virus being administered to a patient to stimulate an immune response. The COVID-19 shots are gene therapies that do not use a live or attenuated virus to stimulate the body's immune system. They actually cause the body via mRNA messaging to produce a spike protein from the best approximation (using some computer simulation) of the SARS-CoV-2 alpha variant, which no longer exists.

[4] *Id.*, Available at https://www.fda.gov/media/144414/download

BNT vaccine is, by definition, not licensed; it is an "unapproved product" under the Emergency Use Authorization ("EUA") statute, 21 U.S.C. §360bbb-3.

29.     It is indisputable that Defendant SECDEF has ordered all active duty, National Guard and reserve service members to be inoculated against COVID-19. Amended Complaint, ¶23. Defendant SECDEF's memorandum also stated that the DOD "will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration." Amended Complaint, ¶25. Yet subsequent documents executing the mandate reveal that the Department of Defense is intentionally not following its own directive, instead, using EUA vaccines because there are insufficient supplies of licensed vaccine available.

30.     In a Memorandum for the Assistant Secretary of the Army (Manpower and Reserve Affairs), Assistant Secretary of the Navy (Manpower and Reserve Affairs), Assistant Secretary of the Air Force (Manpower and Reserve Affairs), and the Director of the Defense Health Agency, Terry Adirim, the Acting Assistant Secretary of Defense for Health Affairs, admitted that the Department of Defense was not administering a fully licensed and approved vaccine members of the Armed Forces, but was instead skirting federal law by mandating an EUA vaccine instead. Specifically, the Memorandum stated that Department of Defense health care providers "*should use doses distributed under the EUA* to administer the vaccination series *as if the doses were the licensed vaccine*." (Exh. 15 to Amended Complaint, ECF #29.)

31.     Part of this confusion stems from the fact that FDA has issued overlapping documents together regarding two separate, "legally distinct" vaccines, Pfizer BNT and COMIRNATY. On the same day that the FDA sent a letter purporting to license COMIRNATY, the letter attempted to link the two vaccines, one licensed (COMIRNATY) and the other unlicensed (Pfizer BNT) in an EUA status, despite the fact that they are "legally distinct."

32.     The Pfizer BNT FACT SHEET (Exh. 12 to Amended Complaint, ECF #29) also attempts to confuse recipients by stating that the two different vaccines "have the same formulation and can be used *interchangeably* to provide the COVID-19 vaccination series[.]"(emphasis added).

33.     "Interchangeable" and "interchangeability"[5] are specifically defined terms in Section 351 of the PHS Act, 42 U.S.C. §262, in relation to a "reference product," which must be a biological product licensed under Section 351(a) of the PHSA. (42 U.S.C. § 262(a)). For the purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product – in this case, the FDA-licensed COMIRNATY shot. The "interchangeable" product, in this case the EUA shot Pfizer BNT, must be the subject of a later filed "abbreviated" application under 42 U.S.C. § 262(k), and there is no indication that any such application was ever filed by BioNTech, much less reviewed or approved by the FDA. This is likely because the effective date of a biosimilar application approval "may not be made effective by the Secretary until the date that is **12 years** after the date on which the reference product was first licensed." 42 U.S.C. §262(k)(7). Finally, and most importantly, the FDA's own "Purple Book" listing of drugs shows that COMIRNATY has "no bioequivalent" and "**no interchangeable**" products.[6]

34.     Most important of all is that the Pfizer BNT shot is *still not licensed* – and by the

_____

[5] "Interchangeable" and "interchangeability" are defined as a "biological product" that "may be substituted for the reference product" by health care providers. 42 U.S.C. § 351(i)(3). To meet the standards in 42 U.S.C. § 262(k)(4) ("Safety standards for determining interchangeability"), the "interchangeable" or substitute biological product (i) must be biosimilar to the reference product and (ii) and "can be expected to produce the same clinical result as the reference product in any given patient." 42 U.S.C. § 262(k)(4).

[6] "The Purple Book database contains information on all FDA-licensed (approved) biological products regulated by the Center for Drug Evaluation and Research (CDER), including *licensed biosimilar and interchangeable products*, and their reference products."(emphasis added). From the FDA's website available here: https://purplebooksearch.fda.gov/ *See* Exh. 17.

explicit terms of the EUA statute, it cannot be mandated. A vaccine also cannot simultaneously be an EUA product for some purposes and also don the FDA license of a "legally distinct" product, such as COMIRNATY, for purposes of being made mandatory and therefore justify charging and jailing people like the Plaintiffs who do not want the government they volunteered to serve to forcibly inoculate them with experimental products.

35.     The FDA licensing regime is a disjunctive one. The public health emergency declaration that justifies the use of an EUA for a product "shall terminate upon the earlier of ... a change in the approval status" of the EUA product. 21 U.S.C. § 360bbb-3(b)(2)(A)(ii). Thus, the approval, or licensing, of a vaccine for a given indication terminates the EUA for that vaccine. The requirements for licensing and emergency use authorization are mutually exclusive; the same product—or same vial of vaccine—cannot be concurrently subject to an EUA and licensed for the same indication or use, under these distinct regulatory regimes.[7] That is by design because the FDA's charter – it's very *reason for being* – is to protect the public against the harms that could result from inadequately tested and regulated products being distributed *en masse* to an unsuspecting public. An unlicensed product like Pfizer BNT, which has not even completed a single, well-controlled clinical trial, cannot also be a licensed product for the same indication – and most assuredly not for the purpose of forcing it on unwilling members of the Armed Forces.

36.     In fact, the Defendant FDA has an *affirmative legal obligation* under the EUA statute to inform people about their right to refuse an unproven, unlicensed, EUA product:

> With respect to the emergency use of an unapproved product, **the Secretary**, to the extent practicable given the applicable circumstances described in subsection (b)(1), **shall**, for a person who carries out any activity for which the authorization is issued, **establish such conditions on an authorization under this section** as

---

[7] *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631 (D.C. Cir. 2020)(holding that the FDA's determination that it could choose to regulate a product as either a drug or a device, or both, as arbitrary and capricious and exceeding its statutory authority).

the Secretary finds necessary or appropriate to protect the public health, **including the following**: ....

> (ii) **Appropriate conditions designed to ensure that individuals to whom the product is administered are informed**—

>> (I) that the Secretary has authorized the emergency use of the product;

>> (II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and

>> (III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I)–(III) (emphasis added).

37.     This requirement is not limited in any way and on its terms applies to *anyone* being offered an EUA product – immigrants, prisoners, healthcare workers, members of the military, federal employees, etc. – this is the codification of the Nuremberg Code's <u>fundamental human right to be free of unwanted medical interventions</u>. This principle runs throughout the entirety of the United States Code, including, as just one example, Institutional Review Board (IRB) requirements for every experiment or drug trial involving human subjects. *See* 21 C.F.R., Title 50, "Protection of Human Subjects."

38.     Notwithstanding federal law, Department of Defense instructions, and individual service regulations, Defendant DoD has instructed the armed services to forcibly inoculate service members with the unlicensed, only Emergency Use Authorized, Pfizer-BioNTech biologic. Amended Complaint, ¶¶26 and 27 (and Exhibits). Defendant FDA has aided and abetted Defendant DOD in this plan by sowing confusion regarding two distinct products and attempting to commingle their legal statuses and make them appear bio-equivalent in complete

contravention of its own regulations regarding interchangeable products, ignoring the plain language of the statutes that govern these products.

39.     Because of Defendant DoD's history of disregarding regulations regarding the administration of unapproved products to members of the military, and because of the possibility that military members might face chemical or biological weapons on the battlefield, Congress passed two additional, specific statutes that require (a) military members be informed of their right to refuse an investigational or experimental product, **and** (b) that the only government official who can waive that right is the President of the United States, in writing. *See* 10 U.S.C. §1107, which covers INDs and even licensed products that are "unapproved for their applied use"; *see also* 10 U.S.C. §1107a, which covers EUA products.

> [A]s a general rule, persons must be made aware of their right to refuse the product (or to refuse it for their children or others without the capacity to consent) and of the potential consequences, if any, of this choice. An exception to this rule is that the president, as commander in chief, can waive military personnel's right to refuse this product. If the right is not specifically waived by the president for a particular product given under EUA, military personnel have the same right to refuse as civilians.[8]

40.     This mandate is a patently illegal order because it simultaneously violates the provisions of 10 U.S.C. §1107a by attempting to skirt the President's non-delegable duty to the All-Volunteer Force as Commander-in-Chief.

> In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act and required under paragraph (1)(A) or (2)(A) of such section 564(e), <u>designed to ensure that individuals are informed of an option to accept or refuse administration of a product</u>, *may be waived only by the*

---

[8] Nightingale SL, Prasher JM, Simonson S. *Emergency Use Authorization (EUA) to Enable Use of Needed Products in Civilian and Military Emergencies*, United States. Emerging Infectious Diseases. 2007;13(7):1046. doi:10.3201/eid1307.061188 available at https://wwwnc.cdc.gov/eid/article/13/7/06-1188_article

> *President only if the President determines*, <u>in writing</u>, that
> complying with such requirement is not in the interests of national
> security.

10 U.S.C. §1107a-(a)(1)(emphasis added).

41.     In addition to forcing service members to submit to inoculation with an unlicensed vaccine, Defendant DoD has ordered vaccination of servicemembers who contracted and recovered from COVID-19, in violation of its own regulations that reflect decades of sound medical practice in virology and immunology. Amended Complaint, ¶24.

42.     Defendant SECDEF's memorandum of August 24, 2021, specifically instructs the Armed Services to ignore any claims for medical exemptions for service members who have immunity from previous COVID-19 infection. *Id.*

43.     In establishing their mandatory vaccination programs, the Armed Services have followed Defendant Austin's instructions, ignoring the COVID-19 infection status of servicemembers, and required all service members to receive the vaccination. Amended Complaint, ¶26.

44.     Army regulation 40-562, "Immunization and Chemoprophylaxis for the Prevention of Infectious Diseases" presumptively exempts from vaccination service members whom the military knows have a previously documented infection with the disease for which the vaccination is being ordered. AR 40-562, ¶2-6(a)(1)(b); Amended Complaint, ¶¶39-42.

45.     Specifically, the regulation states: "2-6.  Exemptions

> There are two types of exemptions from immunization-medical and administrative.  Granting medical exemptions is a medical function. Granting administrative exemptions is a nonmedical function.  a. Medical exemptions…Health Care providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration…  (1) General examples of medical exemptions include the following…  (b) Evidence of immunity based on serologic tests, documented infection, or similar

14

circumstances." *Id*.

46.     Instead of allowing for a proper medical evaluation of individuals with previous COVID-19 infection for purposes of determining whether the individual is exempt, Defendants have ordered their medical staffs to ignore the requirements of this regulation, effectively superseding the medical decision-making function and violating the requirements of their own regulation. The Secretary cannot with a swipe of the pen upend Defendant DOD's written publications and instructions, redefine substantive rights regarding members' healthcare without input or opportunity for public comment – the hallmarks of sound rulemaking decisions under Administrative Procedures Act analysis. "It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. The military departments enjoy no immunity from this proscription." *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) (emphasis added) (citation omitted).

47.     Based on Defendants' own admissions, Plaintiffs – either as the entire class of military members – or solely as the class of members who have already had COVID-19 – have a clear likelihood of success on the merits of their claims for violations of federal law and failure by Defendants to follow their own regulations.

   **C.   Plaintiffs Will Suffer Irreparable Injury if the Injunction Is Denied**

48.     "[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1260 (10th Cir. 2004). Accordingly, a "moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id*. (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d

904, 907 (2d Cir. 1990)). "A plaintiff suffers irreparable injury when the court would be unable

to grant an effective monetary remedy after a full trial because such damages would be

inadequate or difficult to ascertain." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)

(quoting *Dominion*, 269 F.3d at 1156). In addition, the party moving for injunctive relief must

show that the harm is certain as opposed to theoretical, great, and "of such imminence that there

is clear and present need for equitable relief*." Schrier v. Univ. of Colo*., 427 F.3d at 1267;

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003).

49.     In the absence of an injunction, Plaintiffs are facing inoculation with an

unlicensed, novel COVID-19 mRNA biologic product, never before approved by any company

in the United States, and authorized only for use under the terms of an Emergency Use

Authorization from the FDA. It would be hard to imagine a harm more irreparable than a non-

consensual injection of an unlicensed substance into one's person. *Doe*, 297 F.Supp. 2d at 135.

The U.S. Supreme Court has found that the Constitution itself protects a person's right to

"refus[e] unwanted medical care." *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278

(1990); *see also King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). The

Court has explained that the right to refuse medical care derives from the "well-established,

traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v.Quill*, 521

U.S. 793, 807 (1997).

50.     Furthermore, members of the Plaintiffs' class appear to be at a statistically

significant risk for several conditions from the Pfizer BNT biologic, specifically when compared

to the infinitesimal risk that COVID-19 poses to young, healthy members of the U.S. military.[9]

Pfizer and BioNTech's fact sheet lists the following side effects that have been reported for the

---

[9] *See*, *infra*, ¶50.

Pfizer-BioNTech COVID-19 vaccine: myocarditis (inflammation of the heart muscle), pericarditis (inflammation of the lining outside the heart), and swollen lymph nodes, among others. (*See* Exh. 12 to Amended Complaint, ECF #29).

51.     Additionally, members of the Plaintiff class such as U.S. Army LTC Theresa Long, M.D., chief flight surgeon for the U.S. Army's helicopter training center in Fort Rucker, Alabama, continue to witness and receive reports of significant and debilitating vaccine injuries among otherwise healthy young pilots, aircrew, and fellow healthy service members – in contradistinction to the number of healthy people in the military harmed by COVID – which is next to zero. Her whistleblower affidavit is attached and illustrates just how inconsistent this vaccine mandate is with the Army's own aviation and operational risk management doctrines with regard to the risks to the pilots under her charge – and by extension, to healthy servicemembers in general.[10]

52.     The CDC's own passive, pharmacovigilance site – the Vaccine Adverse Event Reporting System ("VAERS") – supports exactly what courageous military doctors such as LTC Long are seeing with their own eyes in their daily practice – unprecedented numbers of adverse reactions among soldiers after receiving these vaccines – numbers that exceed the entirety of all other vaccines combined since the VAERS system began tracking in July 1990.[11] As of the October 8, 2021, weekly (Friday) data download by the CDC, there were 16,766 reported deaths reported in VAERS for CoVID-19 mRNA vaccines since mid-December 2020, when the first EUAs were granted for the Pfizer BNT and Moderna mRNA injectables.[12] There have been more than 795,000 Serious Adverse Events reported to VAERS for COVID-19

---

[10] *See* Exh. 18, Affidavit of LTC Theresa Long, M.D., U.S. Army
[11] *Id.*
[12] *See, e.g.,* "VAERS Summary for COVID-19 Vaccines Through Oct. 8, 2021," available at https://vaersanalysis.info/2021/10/15/vaers-summary-for-covid-19-vaccines-through-10-8-2021/

vaccines; the Pfizer BNT vaccine alone has averaged more than 37.71 reports of death and 1418.31 adverse events – per day – to VAERS in the 301 days since its first EUA was granted. *Id*. The best estimates are that "fewer than 1% of adverse events are reported."

> Adverse events from drugs and vaccines are common, but underreported. Although 25% of ambulatory patients experience an adverse drug event, less than 0.3% of all adverse drug events and 1-13% of serious events are reported to the Food and Drug Administration (FDA). *Likewise, fewer than 1% of vaccine adverse events are reported.* Low reporting rates preclude or slow the identification of 'problem' drugs and vaccines that endanger public health. New surveillance methods for drug and vaccine adverse effects are needed.[13]

53.    The CDC's website also reveals that on August 30, 2021, its Vaccine Safety Team prepared a briefing slide deck illustrating just how unprecedented the cases of myocarditis and pericarditis have been among otherwise healthy subjects, particularly among young men: For the Pfizer BNT vaccine, men age 18-24 were expected to have a likely incident rate of 1-7 cases (per cohort number being examined); instead the CDC highlighted that there had been 134 incidents, a twenty- to one-hundred fold increase from what was expected for that particular *N*. This was true across almost all age groups, but particularly young men and young women.[14]

54.    There is no data in any documents with respect to inoculation of individuals previously infected with COVID-19 because those people were explicitly excluded from the

---

[13] Ross Lazarus, MBBS, MPH, MMed, GDCompSci, "*Electronic Support for Public Health: Vaccine Adverse Event Reporting System, (ESP:VAERS)*," Agency for Health and Research Quality, Dept. of Health and Human Services, Grant ID: R18 HS 017045

[14] *See* "*Myopericarditis following COVID-19 vaccination: Updates from the Vaccine Adverse Event Reporting System (VAERS)*," Aug 30, 2021, John R. Su, MD, PhD, MPH, Vaccine Safety Team, CDC, COVID-19 Vaccine Task Force. Available at https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-08-30/03-COVID-Su-508.pdf

first of the FDA-required clinical trials for the Pfizer BNT, which is currently still underway and will not be completed until 2023.[15]

55.     In short, there is no monetary relief available for Plaintiffs if they are forced to submit to inoculation with an unlicensed substance. By its very essence, their claim establishes irreparable harm to themselves and those similarly situated to them.

**D.  The Balance of Interests Weighs In Favor Of Enjoining Defendants' Conduct**

56.     Plaintiffs and those similarly situated to them have or will suffer violations of their federally protected rights as well as irreparable injuries from Defendants' illegal conduct. On the other hand, the Defendants'– all government agencies – risk no more than a slower rollout of their vaccine mandate than was initially announced or hoped for. The Defendant federal agencies themselves can claim no general federal police power to assume the harms of 'their' citizenry, as was the case for the State of Massachusetts in *Jacobson v. United States*, 197 U.S. 11 (1905). The *Jacobson* court was clear that it was judicial deference to the *state*'s *legislative* enactments and will of the citizens acting through their legislature. Indeed, this mandate not only carries no such imprimatur, but is instead an exercise of naked *Executive* power that runs contrary to the specific *legislative enactments* meant for the *protection of the public*. More importantly, these shots are *not* vaccines in any sense contemplated by the SCOTUS in the Jacobson decision.

57.     Given that it is now clear that (a) the shots do not stop transmission of the virus, (b) do not make the vaccinated any less contagious than the unvaccinated, and (c) were

---

[15] *See* "Vaccine Development – 101," U.S. Food and Drug Administration, available at https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/vaccine-development-101; *See, also* "Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals," NCT04368728, NIH. Available at https://clinicaltrials.gov/ct2/show/NCT04368728

developed for a strain of the virus that is largely extinct, the government faces no concrete harm at all from a mere delay in the rollout of its program that would ensue from this Court's issuance of an injunction.

58.     Plaintiffs face the prospect of having a demonstrably dangerous, unlicensed biologic administered to them without their informed consent. Once they are given the shot, there is literally no remedy that they can pursue to reverse that action.[16] Their interest in preventing Defendants from continuing to break the law could not be more manifest. Contrariwise, there is no pressing military exigency requiring mandatory vaccination for a matter of national security. There is only a public health mandate seeking to use Plaintiffs' military status against them in order to begin the President's desired public health mandate to fruition.

59.     There is no indication that the last 18 months of the pandemic moving through this country has in any way reduced rates of military effectiveness, created a significant loss of personnel or readiness, or in any way affected DoD's ability to perform its missions.

60.     Indeed, medical evidence shows that the overwhelming majority of DoD service members, including the Plaintiff class i.e., a physically fit cohort under the age of 40, have little to fear from this virus.[17]

61.     In short, Defendants have no compelling reason to preclude injunctive relief.  An injunction at this point of the litigation will, instead, confirm the value of having the government follow its own regulations and laws, as well as protect the interests of servicemembers who literally have no other avenue to follow in dealing with patently illegal orders.

### E.  Enjoining Defendants Would Not Be Contrary to Public Interest

---

[16] *See* Dr. Long's Affidavit, *supra*.
[17] https://www.statista.com/statistics/1191568/reported-deaths-from-covid-by-age-us/ Last accessed Sep. 21, 2021

62.     "The right to bodily integrity and the importance of complying with legal requirements, even in the face of requirements that may potentially be inconvenient or burdensome, are among the highest public policy concerns one could articulate." *Doe*, 297 F.Supp 2d, at 134. The general public has an express interest in seeing the Federal government and its entities follow the law. This is particularly true when the law affects the bodily integrity of individuals in the service of their country, have voluntarily relinquished many of the protections available to their civilian counterparts, and put themselves in harm's way to do so.

63.     Accordingly, Plaintiffs have demonstrated all the requisite elements for this court to enter a preliminary injunction against Defendants.

## F.  Waiver of Bond

64.     The court has the discretion to waive the security requirements of Fed.RCiv.P 65 or require only a nominal bond. *Pharmaceutical Soc'y of N.Y. v. Dep't of Soc. Serv.*, 50 F.3d 1168, 1174 (2nd Cir. 1995); *Crowley v. Local 82 Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers*, 679 F.2d 978, 999 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984); *Temple University v. White,* 941 F.2d 201, 220 (3rd Cir. 1991).

65.     Given that this preliminary injunction simply requires the Defendants to follow Federal law, rather than suffer some economic harm as a result of the limitation of their conduct, a bond would be inappropriate.

66.     Moreover, Plaintiffs are seeking to vindicate their statutory protective rights and in this action they are represented pro bono by the attorneys before the Court. Under the circumstances, a bond waiver or a minimal bond is appropriate. *See, Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167, 168–69 (D.D.C. 1971)(requiring the plaintiffs to post security in the case at bar would have the effect of denying the parties' ability to obtain judicial

review); *accord, Environmental Defense Fund v. Corps of Engineers (Tennessee-Tombigbee)*, 331 F.Supp. 925 (D.D.C. 1971)(requiring a bond in the amount of $1.00); *West Virginia Highlands Conservancy v. Island Creek Coal Co.,* 441 F.2d 232 (4th Cir. 1971) (requiring a bond in the amount of $100.00).

67.    Given the evidence that establishes Plaintiffs' claims, a high likelihood of success on the merits makes a bond waiver appropriate. *See, People of State of Cal. Ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985), *amended on other grounds,* 775 F.2d 998 (9th Cir. 1985).

## CONCLUSION

68.    Plaintiffs are currently facing orders from their military superiors to submit to vaccination with an unlicensed, Emergency Use Authorization product.  The vaccination of Plaintiffs and those similarly situated to them are scheduled to be *completed* by the end of November of this year, which means that the requirement to begin inoculation is imminent. If Plaintiffs are successful in litigating the merits of this case, they will have suffered the irreparable injury of inoculation with an injurious or deadly unlicensed substance well before this case moves through the judicial process. The only means of preventing such in irreparable injury is for this court to preliminarily enjoin Defendants from pursuing their vaccination program with an unlicensed vaccine.

69.    Plaintiffs have demonstrated a substantial likelihood of success on the merits, irreparable injuries or death, that the balance is of interests weighs in their favor, and that an injunction is not adverse to public interest; rather it is in the public interest to so grant.

70.    Accordingly, under this Circuit's precedents, Plaintiffs have demonstrated all the relevant factors weigh in favor of the Court granting this motion.

Wherefore, Plaintiffs respectfully pray for the following relief:

    a.  An Order to all Defendants to stop inoculation of Plaintiffs and those similarly situated to them with the any unlicensed vaccines;

    b.  An order requiring Defendant DOD to comply with its own publication, AR 40-562, and ensure that individual service members with preexisting COVID-19 exposure for serological immunity are given an exemption under Defendant DoD's regulations;

    c.  An order prohibiting Defendants from retaliating against or in any other way professionally damaging Plaintiffs, and any other service member objecting to inoculation with the Pfizer-BioNTech EUA product; and

    d.  For any other additional relief as this court deems equitable and proper.

Dated this 2nd day of November, 2021.

Respectfully submitted,

    /S/ *Todd Callender*
Todd S. Callender, Esq.
Colorado Bar #25981
Disabled Rights Advocates PLLC
600 17th St., Suite 2800
Denver, CO 80202
(303) 228 7065, Ext. 7068
todd@dradvocates.com

    /S/ *Dale Saran*
Dale Saran, Esq.
dalesaran@gmail.com
19744 W. 116th Terrace
Olathe, KS 66061
(480)-466-0369
Attorneys for the Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on Nov. 2, 2021, I electronically filed the above-captioned Motion for

Preliminary Injunction and Exhibits with the Clerk of Court using the CM/ECF system, which

sends notifications via electronic mail to any parties or counsel registered on the system. I also

certify that I have caused this to be served on the opposing parties not registered with CM/ECF

using the same addresses used to effect service previously in the case.

/s/ *Todd S. Callender*
Todd Callender, Esq.
Colorado Bar #25981
600 17th St., Suite 2800
South Denver, CO 80202
Telephone: (720) 704-7929
Email: todd@dradvocates.com
Attorney for the Plaintiffs

/s/ *Dale Saran*
Dale Saran, Esq.
MA Bar #654781
19744 W 116th Terrace
Olathe, KS 66061
dalesaran@gmail.com
Telephone: 480-466-0369
Attorney for the Plaintiffs