Exhibit 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| _____ ) | |
| DAN ROBERT, SSG, U.S. Army, ) | |
| HOLLIE MULVIHILL, SSgt, USMC, ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 21-cv-02228-RM |
| ) | |
| LLOYD AUSTIN, in his official ) | |
| capacity as Secretary of Defense, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**DECLARATION OF COLONEL NICOLE C. POWELL-DUNFORD**

I, COL NICOLE C. POWELL-DUNFORD, hereby state and declare as follows:

1.      I currently serve as the Command Surgeon for the U.S. Army Aviation Center of Excellence (USAACE), located at Fort Rucker, Alabama.  I have been in this duty position since June 2021. I am a medical doctor and have been board certified in family medicine since 2004 and aerospace medicine since 2009.  I also concurrently serve as the Public Health Emergency officer for Fort Rucker, having overseen multiple COVID tracking and tracing efforts for the installation. Over the last twenty years, I have served in a number of aeromedical positions for the U.S. Army including serving as the medical director for an en-route care group at the U.S. Army Aeromedical Research Laboratory (2020-2021), the senior flight surgeon and aviation medical clinic chief for the 25th Infantry Division's Combat Aviation Brigade (2011-2012) during which I served deployed to Afghanistan. I have also served as the Director of the U.S. Army Primary Flight Surgeon Course (2009-2011), and deployed as a Task Force flight surgeon (Iraq, 2006-2007; Afghanistan 2004-

2005) as a Task Force Flight Surgeon. Throughout my years of service, I have overseen medical care for approximately 15,000 personnel within aviation units. I have trained over 500 aeromedical providers and oversaw the aeromedical inspection program of 5 military installations. I have personally accrued over 600 flight hours, to include 300 combat hours and have held a student pilot license.

2.      In my current role, my responsibilities include serving as the Commanding General's advisor on all aviation and operational medicine issues, force health readiness, and advocate for the Commanding General's positions on Army Aviation medicine policy and standardization; providing the Commanding General with a continuing assessment of the operational and administrative effectiveness of aviation medicine in ensuring a fit training and operational aviation force; serving as medical liaison with other major commands; working closely with the Lyster Army Health Clinic Commander in ensuring the medical readiness of the approximately 6,722 USAACE Soldiers assigned to this command, as well as the medical care of all people provided for at Fort Rucker. I additionally serve as Medical Director of the installation's Medical Evacuation (MEDEVAC) unit and public health emergency officer for the entire population of Fort Rucker. I also serve as graduate medical education faculty for the School of Army Aviation Medicine, supporting the ongoing medical training for 15 residents in Aerospace Medicine.

3.      I am aware of the allegations set forth in the pleadings filed in this matter, to include that of the declaration made by LTC Theresa Long and filed with the court on November 2, 2021. This declaration is based on my personal knowledge as well as knowledge made available to me in the course of my official duties. Attached to this declaration are authentic copies of relevant military regulations, instructions, and directives, referenced throughout.

4.     The aviation community conducts exceptionally vigorous screening of its pilots which includes flight physicals prior to entry into training, a flight physical on arrival at initial training, and yearly flight physicals.  The medical history and physical screening aspects of the flight physical include a vision and audiology test as well as cardiovascular screening tests.  Specific additional screening requirements occur at five-year and age-specific intervals.

5.     If a medical assessment reveals a condition incompatible with the rigors of flight, the medical provider would then make a recommendation to the Commander that the aircrew member (i.e. pilots and any individual involved in the flight operation of aircraft, to include all non-rated crewmembers, air traffic controllers, unmanned aircraft systems operators, and Department of the Army Civilian personnel and contractors) should not fly.  To formalize this process and ensure mutual understanding, both the Commander, crew member and aeromedical provider/flight surgeon sign a DD Form 2992 or "downslip," which identifies that a medical authority has found that the individual concerned has either been temporarily or permanently disqualified and annotates the reasons on the form.  On resolution of a medical condition, an additional medical screening takes place to validate that the condition has resolved, and this would again be annotated using the DD Form 2992.

6.     Additionally, crew members are required to self-report any changes in medical health immediately to the aeromedical provider/flight surgeon in accordance with Army Regulation (Army Reg.) 40-8, "Temporary Flying Restriction Due to Exogenous Factors Affecting Aircrew Efficiency," dated March 22, 2019.  That regulation delineates the responsibilities of both aeromedical providers and aircrew members to be proactive in identifying, remediating, and reporting exogenous factors (such as the administration of medications or immunizations) that could affect flight duties. Paragraph 4.a. of Army Reg. 40-8

provides that aeromedical providers must be aware of exogenous factors that could affect flight duties and the appropriate preventative measures to mitigate the potential associated aeromedical risk. Similarly, aircrew members are required to "consult with an aeromedical provider anytime a physical or psychological condition is suspected or known to be detrimental to the safe performance of flight duty." Army Reg. 40-8, paragraph 4.b.

       7.     Army Regulation 40-8 sets forth the required flight standards for immunizations generally. In accordance with Army Regulation 40-8, "[m]edical restriction from flying duty will be for a minimum period of 12 hours following any immunization. If any type of reaction occurs, local or systemic, the aircrew member remains restricted from flying duties until cleared by an aeromedical provider." Army Reg. 40-8, paragraph 7.d. In addition, three worldwide messages by the Aeromedical Electronic Resource Office (AERO) for all U.S. Army aeromedical providers/flight surgeons were issued to address COVID Vaccination for aviation personnel. These messages, dated December 13, 2020, December 18, 2020, and September 29, 2021, were distributed to over 15,000 aeromedical providers and across all commands and reiterate that a 12-hour restriction, or longer if duty-limiting systemic effects are indicated, is required after receiving any immunization including that for COVID-19.[1] The requirements found in Army Regulation 40-8 and the three AERO messages regarding COVID immunization standards have been emphasized at length during monthly worldwide aeromedical forums directed at all aeromedical providers/flight surgeons to further ensure standardization. Neither

---

[1] See Aeromedical Electronic Resource Office (AERO) messages dated, September 29, 2021 (directing that medical providers were to "[c]ontinue to manage vaccinations including all COVID vaccines)" in accordance with Army Regulation 40-8); December 18, 2020 (reaffirming that Army policy concerning vaccination remains unchanged and requires 12-hour restrictions or longer in accordance with Army Regulation 40-8); and December 13, 2020 (confirming the applicability of Army Regulation 40-8 restrictions on activities after vaccination).

Army Regulation 40-8, nor the AERO messages prescribe the use of routine post-immunization tests.  In fact, the AERO message dated September 29, 2021, specifically states that there are no new requirements for surveillance of personnel on flight status who are asymptomatic (cardiac or otherwise).

8.      All medicines and immunizations present some degree of inherent risk to patient safety and the aforementioned procedures are in place for the very purpose of detecting, treating, and evaluating the potential impacts of, as relevant here, immunizations.  Many vaccines have potential side effects, and the aviation community is trained to identify and screen for those effects. Side effects for the COVID-19 vaccines are treated in the same manner. In other words, the aviation community, to include aeromedical providers, are aware of the potential side effects of the COVID-19 vaccines and have been trained in identifying and screening for those effects. As dictated by our directives and regulations, aviators and aircrew who have been vaccinated are, at a minimum kept from flying duty for at least 12 hours.  Should a recipient have an adverse reaction to the vaccine, the aircrew member will remain restricted from flying duties until cleared by an aeromedical provider.  More importantly, timing of any potentially adverse reaction to the vaccine is irrelevant.  As previously mentioned, should an aircrew member have any change in their physical condition, they are required to report it to an aeromedical provider.[2] Regardless, whether self-reported or detected through routine screening, a change in physical condition or the presence of any exogenous factor requires reporting and the aircrew member will be restricted from carrying out flying duties until they are cleared by a medical provider.

---

[2] In accordance with Army Regulation 40-8, paragraph 4.c., aeromedical providers have a responsibility to keep aviation unit commanders informed of the health of the command, including the flight readiness of its aircrew.

9.      To date, approximately 3,356 USAACE aviators and aircrew have been fully vaccinated and have continued to carry out more than 186,867 hours of flights and training without any COVID-19 vaccine-related incident.  Additionally, since the beginning of the Army COVID immunization program, approximately 602,322 Army flight hours have been flown without a COVID-19 vaccine-related incident.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 22, 2021, in Fort Rucker, Alabama.

POWELLDUNFORD.NICO   Digitally signed by
LE.CLAUDI.1019008580   POWELLDUNFORD.NICOLE.CLA
                     UDI.1019008580
                     Date: 2021.11.22 17:51:14 -06'00'

Nicole C. Powell-Dunford
Colonel, U.S. Army
Command Surgeon
U.S. Army Aviation Center of Excellence
Fort Rucker, Alabama

**Army Regulation 40–8**

Medical Services

# Temporary Flying Restriction Due to Exogenous Factors Affecting Aircrew Efficiency

Headquarters
Department of the Army
Washington, DC
22 March 2019

**UNCLASSIFIED**

# *SUMMARY of CHANGE*

AR 40–8
Temporary Flying Restriction Due to Exogenous Factors Affecting Aircrew Efficiency

This major revision dated, 22 March 2019

o     Implements NATO Standardization Agreement 3474 (edition 5) (para 1).

o     Defines personnel serving as aeromedical providers (4a).

o     Defines the responsibilities of aircrew members (para 4b).

o     Added provision for underwater escape/Helicopter Emergency Egress Device under hyperbaric exposure (para 7h).

o     Added flying restrictions following dilated eye exams or use of topical ocular medications (para 8).

o     Updates reference publications, forms and internet Uniform Resource Locators (throughout).

**Headquarters
Department of the Army
Washington, DC
22 March 2019**

**\*Army Regulation 40–8**

**Effective 22 April 2019**

Medical Services

# Temporary Flying Restriction Due to Exogenous Factors Affecting Aircrew Efficiency

By Order of the Secretary of the Army:

**MARK A. MILLEY**
*General, United States Army
Chief of Staff*

Official:

*[signature]*

**KATHLEEN S. MILLER**
*Administrative Assistant
to the Secretary of the Army*

**History.** This publication is a major revision.

**Summary.** This regulation provides implementation guidance for NATO Standardization Agreement 3473 (edition 5).

**Applicability.** This regulation applies to the Regular Army and the U. S. Army Reserve. It also applies to all Department of the Army civilian or contractor personnel, unless otherwise stated.

**Proponent and exception authority.** The proponent of this regulation is The Surgeon General. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (see appendix B).

**Supplementation.** Supplementation of this regulation and establishment of agency, command, and installation forms are prohibited without prior approval from Headquarters, Department of the Army (DASG–HCZ), Washington, DC 20310.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to HQDA (DASG–HCZ) Washington, DC 20310.

**Distribution.** This regulation is available in electronic media only and is intended for the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

## Contents (Listed by paragraph and page number)

Purpose • 1, *page 1*
References • 2, *page 1*
Explanation of abbreviations and terms • 3, *page 1*
Responsibilities • 4, *page 1*
General • 5, *page 1*
Exogenous Factors • 6, *page 2*
Vision • 7, *page 3*

**Appendixes**

**A.** References, *page 4*

**B.** Internal Control Evaluation, *page 5*

**Glossary**

---

## 1. Purpose

This regulation implements NATO STANAG 3474 (edition 5). It stipulates the minimum self-imposed temporary restrictions to be placed upon aircrew following exposure to certain physiological conditions in order to ensure optimal physiologic and psychological fitness in aircrew.

## 2. References

See appendix A.

## 3. Explanation of abbreviations and terms

See the glossary.

## 4. Responsibilities

The Surgeon General (TSG) has the overall responsibility for temporary flying restrictions due to exogenous factors affecting aircrew efficiency. TSG will ensure—

*a.* Aeromedical providers are aware of the exogenous factors affecting flight duties and the appropriate preventative measures to mitigate the potential associated aeromedical risk. The aeromedical provider will supervise and coordinate all medical treatment of all aircrew members for reasons of flight safety. The term aeromedical provider refers to the following personnel:

(1) Flight Surgeon (FS); Area of Concentration (AOC); 65DM3.

(2) Aeromedical Physician Assistant (APA); AOC 65DM3.

(3) Aviation Medicine Nurse Practitioner (AMNP); AOC 66NP1.

(4) Aviation Medical Examiner (AME).

*b.* Aircrew members consult an aeromedical provider anytime a physical or psychological condition is suspected or known to be detrimental to the safe performance of flight duty. Aircrew members will notify their aeromedical provider when they have participated in activities or received treatment for which flying restrictions may be appropriate. This includes exposure to exogenous factors listed in this regulation as well as any treatment or procedure performed by a non-aeromedical provider. This includes, but is not limited to, the following:

(1) Any medical or dental procedure requiring use of medication after the treatment.

(2) Any medical or dental procedure requiring the use of any type of anesthesia or sedation.

(3) Treatment by mental health professionals, including but not limited to psychological, social, psychiatric, alcohol, or substance abuse counseling.

(4) Any chiropractic or osteopathic manipulative treatment.

(5) Any treatment given by a homeopath, naturopath, herbalist, or practitioner of other types of alternative medicine.

(6) Any emergency room or urgent care visits.

*c.* The aeromedical provider will—

(1) Keep the aviation unit commander informed of the health of the command as it pertains to aircrew and unit readiness, recommend flight restrictions when applicable, and ensure that aviation unit personnel are familiar with the physiological limitations of flying found in TC 3–04.93.

(2) Participate in the unit safety program including the steering committee and instruction of aircrew on aeromedical and flight environmental topics.

(3) Make provisions of this regulation known and readily available for all supported flight personnel.

## 5. Records management (recordkeeping) requirements

The records management requirement for all record numbers, associated forms, and reports required by this regulation are addressed in the Army Records Retention Schedule-Army (RRS–A). Detailed information for all related record numbers, forms, and reports are located in ARIMS/RRS–A at https://www.arims.army.mil. If any record numbers, forms, and reports are not current, addressed, and/or published correctly in ARIMS/RRS–A, see DA Pam 25–403 for guidance.

## 6. General

*a.* Aircrew members must have optimal physiological and psychological fitness in order to perform their duties safely and efficiently. The term aircrew, or aircrew members, applies to any individual involved in the flight operation of aircraft, to include all non-rated crewmembers, air traffic controllers, unmanned aircraft systems operators, and Department of the Army Civilian personnel and contractors. The provisions of this regulation will apply regardless of flight activity category or readiness level.

*b.* Apart from pathological conditions, fitness may be adversely affected by a variety of exogenous factors, the effects of which may be hardly perceptible and, therefore, negligible in everyday activities; however, these same factors may have a considerable effect on aircrew efficiency.

*c.* In those instances where an aeromedical provider is not assigned to a unit or installation, or is otherwise not immediately available, a physician may return aircrew members to flight duty after remote consultation with an aeromedical provider. This clearance will be recorded in the medical record and on the DD Form 2992 (Medical Recommendation for Flying or Special Operational Duty).

*d.* Aeromedical providers will not serve as their own primary care managers. Aeromedical providers on flight status shall not aeromedically clear themselves for flying duty. Should another aeromedical provider not be available for this purpose, clearance may be performed remotely, as described in paragraph 6c above.

## 7. Exogenous Factors

Factors to consider and appropriate medical restrictions to flying activities include, but are not limited to—

*a. Administration of medications.*

(1) *Medication Use.* Use of medications will be with the knowledge of an aeromedical provider. Aircrew members taking any medications will be restricted from flying duties until convalescence and/or rehabilitation is completed, unless cleared for flying duties by an aeromedical provider. Self-medication is permitted only in accordance with the over-the-counter medication aeromedical policy letter (APL). The most recent APL is available at https://vfso.rucker.amedd.army.mil or http://www.rucker.amedd.army.mil/tools/links.html.

(2) *Anesthesia.* Aircrew will be restricted from flying duty for 48 hours after general, spinal, or epidural anesthesia or conscious sedation, and for a minimum of 12 hours after local or regional anesthesia, to include dental.

*b. Use of dietary supplements, herbal and dietary aids, and performance enhancers.* All supplements, herbal and dietary aids, preparations, and performance enhancers are prohibited unless cleared by the aeromedical provider in consultation with applicable APLs.

*c. Alcohol.* Aircrew will not perform aviation duties for a minimum of 12 hours after the last drink consumed and until no residual effects remain.

*d. Immunizations.* Medical restriction from flying duty will be for a minimum period of 12 hours following any immunization. If any type of reaction occurs, local or systemic, the aircrew member remains restricted from flying duties until cleared by an aeromedical provider.

*e. O-chlorobenzylmalonitrile/tear gas exposure.* Aircrew will not be restricted from flying duties after exposure as long as there are no residual systemic effects (for example, coughing, wheezing, or shortness of breath), and all local effects (for example, tearing, eye pain, skin discomfort) have resolved and any contaminated clothing or aviation life support equipment has either been exchanged or decontaminated. Exposure to any other nuclear, biologic, or chemical agent or simulant will require clearance from an aeromedical provider before flight duties can be resumed.

*f. Blood or plasma donation.* Aircrew members will not be regular (more than two times per year) blood or plasma donors. Following blood donation (200 cubic centimeters or more), aircrew members will be restricted from flying duty for a period of 72 hours. Following plasma donation, aircrew members will be restricted from flying duty for a period of 24 hours. Bone marrow donors will be cleared by an aeromedical provider prior to returning to flight duties.

*g. Decompression experience/hypobaric chamber runs.*

(1) Any adverse reaction, barotraumas, or decompression sickness resulting from a decompression experience, requires restriction from flying duties until cleared by an aeromedical provider.

(2) Flight personnel will not perform high altitude flight duties for 24 hours after exposure to hypobaric chamber runs in excess of 25,000 feet. They may perform flying duties during the minimal 24 hours following a decompression experience in aircraft where cabin altitude does not exceed 10,000 feet. Heavy exercise or work may mimic the signs and symptoms of decompression sickness and are discouraged in the 24-hour period following a decompression experience.

*h. Diving and hyperbaric exposure.*

(1) Aircrew members will not fly or perform low pressure altitude chamber flights within 24 hours following self-contained underwater breathing apparatus (SCUBA) diving, compressed air dives, or hyperbaric chamber exposures. When urgent operational requirement dictates, aviation personnel may fly within 24 hours of SCUBA diving provided no symptoms of decompression sickness have developed and the aircrew members are examined and cleared to perform flying duties by an aeromedical provider (or provider trained in diving medicine/diving medicine officer).

(2) Following underwater escape/Helicopter Emergency Egress Device training, aircrew members may fly within 24 hours provided the aircraft's maximum altitude (or cabin altitude) remains below 10,000 feet above mean sea level.

(3) Decompression sickness, resulting from diving or other hyperbaric exposure, requires a restriction from flying duties by an aeromedical provider.

*i. Tobacco.* Smoking and use of tobacco products degrade physical performance, including vision. Aircrew members are discouraged from smoking and using tobacco products at all times.

*j. Strenuous physical activities.* Strenuous training events, sporting activities, or work may adversely affect the ability of aircrew members to perform their respective flight tasks safely. Aeromedical providers must recognize when this occurs, or is likely to occur, and advise commanders as to any restrictions applicable either to units or individuals. Examples of strenuous training events or work include, but are not limited to, those listed in ATP 4–25.12 and GTA 05–08–012.

*k. Simulator training.* Under ordinary circumstances, restrictions on actual flight are not required after simulator training, provided there are no symptoms of simulator sickness. Simulator sickness can occur in any aircrew, regardless of experience level. Aircrew exhibiting symptoms of simulator sickness will be restricted from actual flight for 12 hours after full resolution of symptoms.

*l. Centrifuge runs.* Centrifuge runs may adversely affect aircrew due to the physical strain of high G-load and sensory disturbance. Aircrews are restricted from all flying duties for a minimum of 6 hours after centrifuge runs and until no residual effects remain.

## 8. Vision

*a. Corrective Lenses.* Aircrew members requiring corrective lenses in order to achieve 20/20 vision will be restricted from flying duties unless they are wearing either spectacle or contact lenses which provide 20/20 vision, near and far vision bilaterally. Aircrew members will use contact lenses only as specified in the Contact Lens APL.

*b. Ocular medication use.* Aircrew members will be restricted from flying duties for 24 hours (or as otherwise specified by an aeromedical provider) following dilated eye exams or use of ocular cycloplegic, mydriatic, or miotic agents.

**Appendix A**

**References**

**Section I**

**Required Publications**

This section contains no entries.

**Section II**

**Related Publications**

A related publication is a source of additional information. The user does not have to read a related reference to understand this publication.

**AR 11–2**
Managers' Internal Control Program

**AR 25–30**
Army Publishing Program

**AR 40–501**
Standards of Medical Fitness

**ATP 4–25.12**
Unit Field Sanitation Teams

**GTA 05–08–012**
Individual Safety Card

**NATO STANAG 3474**
Temporary Flying Restrictions Due to Exogenous Factors Affecting Aircrew Efficiency (available at https://nso.nato.int/nso/)

**TC 3–04.93**
Aeromedical Training for Flight Personnel

**Section III**

**Prescribed Forms**

This section contains no entries.

**Section IV**

**Referenced Forms**

Unless otherwise indicated, DA forms are available on the Army Publishing Directorate (APD) website (http://armypubs.army.mil); DD forms are available on the OSD website (www.dtic.mil/whs/directives/forms/index.htm); and standard forms (SF) are available on the U.S. General Services Administration website (https://www.gsa.gov/portal/forms/type/sf/).

**DA Form 11–2**
Internal Control Evaluation Certification

**DA Form 2028**
Recommended Changes to Publications and Blank Forms

**DD Form 2992**
Medical Recommendation for Flying or Special Operational Duty

**Appendix B**

**Internal Control Evaluation**

**B–1. Function**
The function covered by this evaluation is aviation medicine.

**B–2. Purpose**
The purpose of this evaluation is to assist commanders and aeromedical providers in evaluating key internal controls listed below. It is not intended to cover all controls.

**B–3. Instructions**
Answers must be based on the actual testing of internal controls (for example, document analysis, direct observation, sampling, simulation, other). Answers that indicate deficiencies must be explained and the corrective action identified in supporting documentation. These internal controls must be evaluated once every three years. Certification that the evaluation has been conducted must be accomplished on DA Form 11–2 (Internal Control Evaluation Certification). This form is available on the Army Publishing Directorate website.

**B–4. Test Questions**
   *a.* Have unit commanders established, in writing, an Aviation Medicine standard operating procedures (SOP) that addresses crewmember compliance with AR 40–8?
   *b.* Have aeromedical providers established a written Aviation Medicine SOP that addresses crewmember compliance with AR 40–8?
   *c.* Do medical providers conduct a review of crewmembers' medical histories to determine compliance with AR 40–8 and issue a DD Form 2992 accordingly when temporary or permanent restriction from flying duties is required?
   *d.* Does the U.S. Army Aeromedical Activity review information contained within the Aviation Electronic Resource Office (available at https://vfso.rucker.amedd.army.mil) and/or service treatment records to ensure crewmember compliance with AR 40–8?
   *e.* Does the Dean, School of Army Aviation Medicine ensure that the Aviation Medicine functional area of the Aviation Resource Management Survey (ARMS) is conducted on all aviation units in concert with the Forces Command ARMS every 24 to 36 months?

**B–5. Supersession**
Not applicable.

**B–6. Comments**
Help make this a better tool for evaluating internal controls. Submit comments to Office of the Surgeon General, 7700 Arlington Boulevard, Falls Church, VA 22042–5140.

## Glossary

**Section I**

**Abbreviations**

**AME**
aviation medical examiner

**AMNP**
aviation medicine nurse practitioner

**AOC**
area of concentration

**APA**
aeromedical physician assistant

**APL**
aeromedical policy letter

**ARMS**
Aviation Resource Management Survey

**FS**
flight surgeon

**SCUBA**
self-contained underwater breathing apparatus

**SOP**
standard operating procedures

**TSG**
The Surgeon General

**Section II**

**Terms**
This section contains no entries.

**Section III**

**Special Abbreviations and Terms**
This section contains no entries.

**UNCLASSIFIED**

PIN 000503–000

29 Sep 2021

This message is intended primarily for ARMY users.

Army Aviation Medicine Providers,

BLUF: Continue to manage vaccinations (including all COVID vaccines) IAW AR 40-8. There are no new requirements for surveillance of personnel on flight status who are asymptomatic (cardiac or otherwise). Continue to refer symptomatic personnel on flight status for specialty evaluations, as clinically indicated.

///BREAK///

Recently, there have been posts on social media regarding Army policy on COVID vaccination for aviators. This does not represent the consensus medical opinion of Army Aerospace Medicine and will have no bearing on current Army aeromedical policy.

AAMA is responsible for Army aviation medicine policy, especially the intricacies of "grounding" personnel on flight status. This system is predicated upon local aviation medicine providers making risk assessments IAW evidence-based AAMA policy and forwarding recommendations to a command authority, who makes the final determination of fitness for duty. This integrated approach optimizes Army Aviation readiness and the safety of global Army Aviation flight operations.

AAMA's COVID policies have not changed - return to duty following COVID vaccination remains IAW AR 40-8, paragraph 7d. COVID vaccination should be encouraged for all personnel on flight status, as supported by quality scientific evidence. Continue active surveillance in your clinical and flight line encounters. If aviation personnel are symptomatic (whether after vaccination or confirmed disease), refer them for evaluation, follow previous "Post-COVID Return to Flight Status" & return to exercise (profiling) guidance IAW Figure 11 and Appendix K of the latest "DoD COVID-19 Practice Management Guide."

-----------------------------------------------------------------------------------------------------------------------

18 Dec 2020

This message is intended primarily for ARMY users.

Army Aviation Medicine Providers,


The Army policy remains unchanged:

- Vaccination is encouraged for all, but remains voluntary until full FDA approval (expected NET Apr 2021)

- 12-hr restriction, or longer if duty-limiting systemic effects (IAW AR 40-8)

- Recommend staggered vaccination groups within aviation formations to mitigate cumulative readiness and operational degradations.

---------------------------------------------------------------------------------------------------

13 Dec 2020

This message is intended primarily for ARMY users.

Army Aviation Medicine Providers,

Operation Warp Speed is living up to its name, and we owe you "living" guidance which follows the science and protects our aviation community while optimizing readiness. In that vein, Army Aerospace SME consensus (at this moment) follows:

**BLUF:** The COVID vaccine (under EUA) is voluntary for ALL army aviation personnel, will follow CDC priorities, and any restrictions remain guided by AR 40-8 (immunizations), with additional considerations (below) for any individual with a history of anaphylaxis.*

**Amplifying information:** OTSG has directed that vaccines under EUA are voluntary. Army aviation medicine guidance is nested with this and will not mandate EUA vaccination for any Army aviation personnel. This is especially important for aviation personnel within our ranks who simultaneously hold FAA certification, as the FAA COULD pull the medical clearance for those receiving the vaccine prior to FULL FDA approval.

Additionally, OTSG has directed that the Army will follow CDC prioritization, meaning the vast majority of aviation personnel will be Tier 3 (low priority) unless identified as a higher tier (e.g. health care providers, deploying personnel, etc) by a command authority.

BLUF: The COVID vaccine (under EUA) is voluntary for ALL army aviation personnel, will follow CDC priorities, and any restrictions remain guided by AR 40-8 (immunizations), with additional considerations (below) for any individual with a history of anaphylaxis.*

Amplifying information: OTSG has directed that vaccines under EUA are voluntary. Army aviation medicine guidance is nested with this and will not mandate EUA vaccination for any Army aviation personnel. This is especially important for aviation personnel within our ranks who simultaneously hold FAA certification, as the FAA COULD pull the medical clearance for those receiving the vaccine prior to FULL FDA approval.

Additionally, OTSG has directed that the Army will follow CDC prioritization, meaning the vast majority of aviation personnel will be Tier 3 (low priority) unless identified as a higher tier (e.g. health care providers, deploying personnel, etc) by a command authority.

If flight personnel are prioritized by a command authority and they individually volunteer to receive the vaccine, implement restrictions IAW 40-8:

- 12 hour restriction following vaccination;

- Further restriction, if any systemic symptoms (e.g. fatigue, headache, fever/chills, body aches, etc.) until cleared by an aeromedical provider (likely 48-72 hours).


* Due to two allergic reactions reported by UK authorities during initial vaccine deployment, experts have urged that any person "with a history of anaphylaxis to a vaccine, medicine, or food should not receive the…vaccine." Out of an abundance of caution, AAMA highlights this restriction as a prudent measure until more evidence is available. If there are compelling reasons to warrant vaccination in such an individual, we recommend the EUA vaccine is administered by ACLS-qualified personnel at an MTF with full resuscitative capabilities.

Considerations:

As you know, aviation safety, as optimized by the Aviation Medicine Program, is predicated on timely and honest communication between flight personnel, their aviation medicine provider, and their command team. AR 40-8 leverages this paradigm to enhance aviation safety without unnecessarily restricting the commander or mission.

On that note, operational aviation commanders, in consultation with local aviation medicine support, should consider staggered vaccinations within their formations (e.g. 10-20% of flight crews every week). Phase 3 vaccine data suggests high side effect profiles in recipients, especially after the second dose, causing potential "grounding" rates exceeding 20% of recipients for an average of 48-72 hours following inoculation. Staggering their force implementation may help commanders minimize cumulative readiness and operational degradations.

More evidence is expected in the near future which will allow AAMA to refine and/or update these recommendations.