## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

DANIEL ROBERT            \*
SSG, U.S. ARMY          \*
                             \*
HOLLIE MULVIHILL       \*
SSGT, USMC             \*
                             \*
       Plaintiffs,           \*
                             \*
          v.              \*
                             \*      Civil Action No. 1:21-cv-2228-RM-STV
LLOYD AUSTIN            \*
Secretary of Defense,      \*
U.S.  DEPARTMENT OF DEFENSE    \*
Washington, D.C. 20301      \*
                             \*
       and                \*
                             \*
XAVIER BECERRA         \*
Secretary of the U.S. Department of   \*
Health and Human Services     \*
U.S. DEPARTMENT OF HEALTH    \*
AND HUMAN SERVICES      \*
                             \*
       and              \*
                             \*
JANET WOODCOCK, Acting    \*
Commissioner of the Food & Drug    \*
Administration            \*
U.S. FOOD AND          \*
DRUG ADMINISTRATION      \*
                             \*
UNITED STATES OF AMERICA    \*
                             \*
       Defendants.         \*
\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S REPLY TO DEFNDANT'S RESPONSE TO PRELIMINARY INJUNCTION MOTION

Now come the Plaintiffs by and through their counsel with this Reply to the Defendants' Response.

1

> Members of the military are not shorn of their constitutional rights
> while they remain in the military service. Blackstone said: "… he
> puts not off the citizen when he enters the camp; but it is because
> he is a citizen, and would wish to continue so, that he makes
> himself for a while a soldier."[1]

1.      It is beyond dispute that the Phase 3 clinical trial for BioNTech's BNT162b2 is ongoing right now.[2] It is on the Defendant FDA's website and the Defendants' own response makes mention of this clinical trial in defense of the Defendant DoD's mandate. This study began just after the start of the pandemic – in April 2020 – and it will not be completed until May 2023. This is the "Phase 3 controlled, clinical trial" that is a mandatory, non-negotiable requirement for BNT162b2 to become a product with "full licensure from the [FDA]" under federal law. See, e.g., 21 U.S.C. §314.50, et seq. (Listing the requirements before a New Drug Application may be approved by the FDA.)

2.      In order to have a Phase 3 clinical trial for BNT, Pfizer and BioNTech had to *solicit volunteers*. Pfizer, Inc. and BioNTech could not, for example, go out on the streets of America and kidnap people, or threaten to take away their jobs if they didn't participate in the Phase 3 Clinical trial… which, as noted above, is still ongoing. Institutional Review Board procedures (IRB) require every single subject's VOLUNTARY, INFORMED CONSENT, in order to give them Pfizer BNT-162b2. See 21 U.S.C. §314.50(d)(3)(i)("Applications are required… to contain… a statement with respect to each study that it either was conducted in compliance with the institutional review board regulations in part 56, or was not subject to the regulations under § 56.104 or § 56.105, and *that it was conducted in compliance with the informed consent regulations in part 50*.")(emphasis added).

---

[1] *U.S. v. Manuel*, 43 M.J. 282, 286 (C.A.A.F. 1995)(citations omitted).
[2] https://clinicaltrials.gov/ct2/show/NCT04368728

3.      To be clear, this *clinical trial* is a medical experiment[3] to determine if Pfizer BNT-162b2 can meet the rigorous standards necessary to be allowed to be sold in commerce as a fully-licensed product under the Food, Drug, and Cosmetic Act – and it *still hasn't been completed*. So what Defendant FDA and this Court must answer in deciding the issue of whether Plaintiffs deserve a Preliminary Injunction is how can it be logically and legally possible that *at the exact same time* that the Phase 3 clinical trial is *still ongoing* – and under Institutional Review Board (IRB) procedures requiring informed consent – that the same exact drug, for the same exact indication can be *mandated* upon pain of losing your job or, in a military member's case, upon pain of being imprisoned? The answer is that it cannot. It is not legally or logically possible.

4.      The Plaintiffs begin with the recent federal court ruling on a similar PI Motion in Doe, *et al*, v. Austin, 3:21-cv-1211-AW-HTC in the Northern District of Florida, which was decided after Plaintiffs filed their PI Motion. While it is obviously not controlling, the case is cited by the Defendants as persuasive authority here because similarly situated military plaintiffs were denied an injunction. That contention needs to be analyzed under the full light of the case, rather than as a bare citation in Defendants' brief because it provides a useful framework for analyzing the central elements of this case and raised by the incongruity noted *infra*, at ¶¶2-3, namely: (1) what is the legal status of Comirnaty and BNT-162b2 *viz a viz* the EUA statute; (2) are these two drugs "interchangeable"; and (3) what is the impact of 10 U.S.C. §1107a?

5.      The judge in Doe. v. Austin denied the plaintiffs Motion for a Preliminary

---

[3] "Clinical investigation means any experiment in which a drug is administered or dispensed to, or used involving, one or more human subjects. For the purposes of this part, an experiment is any use of a drug except for the use of a marketed drug in the course of medical practice." 21 C.F.R. §312.30.

Injunction because "no plaintiff claims he or she was specifically denied a BLA-compliant dose or offered only a dose from a non-BLA-compliant vial. Because the plaintiffs have not shown they are (or will be) required to receive an EUA-labeled, non-BLA- compliant vaccine, the plaintiffs have not shown a likelihood of success."[4]

6.      SSgt Cami Long, USMC, currently attends Colorado University (Boulder) and is among a unique group of enlisted Marines in the Marine Enlisted Commissioning Program (MECEP).[5]  Picked from among thousands of applicants by the Marine Corps, SSgt Long attends college on a scholarship and upon completing the requirements for a Bachelor's Degree, and successfully complete Officer Candidate School (typically the summer between Junior and Senior year of college), she is slated to graduate and then receive a commission. She would then return to the Marine Corps as a Commissioned Officer. As her declaration indicates, SSgt Long is now being processed for administrative separation from the Marine Corps. She will be kicked out of the Marine Corps on the grounds of "Commission of a Serious Offense," lose her VA benefits, be forced to repay any tuition the Marine Corps has paid, and lose her post-9/11 GI Bill Benefits, and potentially receive less than a fully Honorable discharge, because she asked to receive only "a product that has received full licensure from the FDA," just as Defendant Austin has stated in his order.[6]

7.      SSG Steven Brown, U.S. Army, is a paratrooper and squad leader stationed Casermo Del Din, Italy. He has meticulously documented his insistence on receiving only the licensed Comirnaty shot. He has tried his best to educate his command about the distinction between EUA and fully-licensed biologics. All of this has resulted in adverse action and a flag in

---

[4] <u>Doe v. Austin</u>, 3:21-cv-1211, Dkt. #47, p.16. (A copy is attached to this Reply as Exh. 19).
[5] <u>See</u> MCO 1040.43B
[6] Exhibit 20, Declaration of SSgt Cambria "Cami" Long, USMC.

his record that will bar him from re-enlistment.[7]

8.   As a preliminary matter, therefore, Plaintiffs here have submitted the missing evidence that the judge believed was necessary in order to grant an injunction in Doe v. Austin. The declarations should also serve to answer satisfy Defendants' claims regarding a lack of court jurisdiction. SSgt Long is in this court's jurisdiction, has no exemption requests pending, and SSG Brown is in Italy and should be able to avail himself of this court for relief.[8]

9.   The court in Doe v. Austin spent considerable time analyzing 10 U.S.C. §1107a and the Defendant DoD and FDA's arguments that these two distinct products are "interchangeable" and that BNT162b2 can simply be substituted in place of the licensed product Comirnaty.

> Section 1107a's explicit cross-reference to the EUA provisions suggests a concern that drugs mandated for military personnel be actually BLA-approved, not merely chemically similar to a BLA-approved drug. And the distinction is more than mere labeling: to be BLA compliant, the drug must be produced at approved facilities… 21 C.F.R. §§ 600.11, 600.20-.21, and there is no indication that all EUA-labeled vials are from BLA-approved facilities. Moreover, the DOD concedes that some of its current vials are not BLA-compliant, and *that there is no policy to ensure that servicemembers get only BLA-compliant vaccines*. It is difficult to see how vials that the DOD admits are not BLA-compliant—and thus could only be EUA products—could fall outside § 1107a's prohibition on mandatory administration.

---

[7] Exhibit 21, Declaration of SSG Steven Brown, USA, dtd 3 Dec 2021. Both SSG Brown and SSgt Long request to be added to this action as named Plaintiffs. If this Court deems it necessary, Plaintiffs will move to amend the complaint to add both as named Plaintiffs to assuage any jurisdictional concerns of the defendants until such time as the Court may rule on the well-pleaded class allegations made by Plaintiffs in their Amended Complaint.

[8] Plaintiffs believe that the Defendant DoD should be judicially estopped from arguing that Plaintiffs' should not be able to avail themselves of this court's jurisdiction when it is Defendants' themselves who control the exemption process in their complete discretion. For example, SSgt Mulvihill's medical condition is one that the Defendant DoD has specifically claimed is NOT grounds for being excused from the shot, but Defendants' agents gave one to SSgt Mulvihill and now to the Court that she is ineligible to present her case. The doctrine of judicial estoppel is designed to prevent exactly this kind of manipulation of the courts by defendants.

Doe v. Austin, p. 14-15. (emphasis added).

10.     The court there is correct in its read of 10 U.S.C. §1107a and the Congressional concerns that service members receive only products that have completed all of the requirements to be licensed products. ("The DOD acknowledges that the President has not executed a wavier under this section, so as things now stand, the DOD cannot mandate vaccines that only have an EUA. 10 U.S.C. § 1107a(a)(1).") The court's confusion, however, about why the Defendant DoD and FDA have no process in place to ensure service members receive only BLA-compliant shots is because (1) the court was misled by the Defendants on the record regarding the availability of Comirnaty, and (2) the judge has (unfortunately) misread the EUA statute. These are directly related issues under the EUA statute.

> Notably, though, the plaintiffs have shown that the DOD is requiring injections from vials not labeled "Comirnaty." Indeed, defense counsel could not even say whether vaccines labeled "Comirnaty" exist at all. (Although the DOD's response said it had an adequate Comirnaty supply, it later clarified that it was mandating vaccines from EUA-labeled vials.)[9]
> …
> The DOD claims it possesses "hundreds of thousands of BLA-compliant vaccine doses that are EUA-labeled, and is using them." If the DOD is, in fact, administering Comirnaty (albeit EUA-labeled Comirnaty), the plaintiffs' § 1107a issue disappears.

11.     The EUA statute explicitly prohibits the Defendant FDA Secretary from granting an EUA for a product if there is an alternative licensed product available. There simply is no equivocation in the statute. "The Secretary may issue an authorization under this section with respect to the emergency use of a product ***only if***… the Secretary concludes-" and what follows is a list of the five requisite conditions that must be met before an EUA may be issued. Condition

---

[9] Doe v. Austin, at 13, 15 (internal citations omitted). Whether the court was misled intentionally or accidentally will be for others to determine, but for the reasons listed *supra* at ¶¶12-16 suggest that Defendant FDA's counsel was somewhat short of the duty of candor to that court.

(3) is plain as day:

> (3) that there is <u>no</u> <u>adequate</u>, <u>approved</u>, and <u>available</u> alternative to
> the product for diagnosing, preventing, or treating such disease or
> condition;

21 U.S.C. Sec. 360bbb-3(c)(3).

Which is to say, if a fully-licensed product (like Comirnaty) is available, then the Secretary is

absolutely **prohibited** from issuing an EUA to treat the same condition.

12.     If there were any question about this pre-condition generally or in this specific

case, all questions of interpretation are answered by the Defendant FDA's EUA authorization

letter of 23 Aug 2021 regarding Pfizer BioNTech BNT162b2. (*See* Exh. 11 to Amended

Complaint, ECF #29). That letter is from the FDA's Chief Scientist, RADM Denise Hinton, and

it explicitly cites this same statutory provision, using the identical header and language from the

statute ("Criteria for Issuance of Authorization"):

> I have concluded that the emergency use of Pfizer-BioNTech
> COVID-19 Vaccine for the prevention of COVID-19 when
> administered as described in the Scope of Authorization (Section
> II) meets the criteria for issuance of an authorization under
> Section 564(c) of the Act, because… *There is no adequate,*
> *approved, and available alternative* to the emergency use of
> Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19."[10]

13.     Footnote 9 to that paragraph also includes an extended explanation regarding

Comirnaty's unavailability. ("…there is not sufficient approved vaccine available for distribution

to this population in its entirety at the time of reissuance of this EUA. Additionally, there are no

products that are approved to prevent COVID-19 in individuals age 12 through 15, or that are

approved to provide an additional dose to the immunocompromised population described in this

---

[10] Exh. 11, to Amended Complaint, ECF #29, (internal citations omitted).

EUA.")

    14.    TSgt Tyler J. Whitney, USAF, was the Medical Group Executive Officer at McConell Air Force Base, Kansas, from 1 Dec 2020 through 1 Nov 2021. He was responsible for "all official communication to & from our medical clinic with the 22nd McConnell base tenants, the Air Force Medical Services, and the Defense Health Agency, as well as coordinating all COVID-19 vaccine meeting with all executive medical staff within the 22nd MDG." TSgt Whitney avers the following:

> There is no Comirnaty COVID-19 vaccines available in the 22nd MDG Military Treatment Facility (MTF) and [I] can confirm that *the Comirnaty COVID-19 vaccine has never been available at our clinic*, as of 19 November 2021, as the attached pictures show from the Defense Medical Logistics Standard Support (DMLSS), which is the system utilized for purchasing all medical supplies. The only COVID-19 vaccines that have been purchased/utilized within our MTF are the COVID-19 Emergency Use Authorization (EUA) vaccines (Pfizer/BioNTech and Moderna), as shown again in the DMLSS picture. The system allows a user to search items available within the MTF, as well as any items that have ever been inputted for purchase from any other base that utilizes the system.

> I can confirm that there are [sic] currently no licensed product with the name of "Comirnaty" that have ever been available at the 22nd MDG on McConnell AFB, nor has any product with the name "Comirnaty" ever been available for purchase within the entire DMLSS system, as of 19 November 2021.[11]

    15.    This is not an accident or coincidence. It's because there legally *can't* be any Comirnaty. The CDC's own website confirms this – "COMINARTY products are not orderable at this time. NDCs are listed per FDA Structured Product Label (SPL) document for the BLA licensed product. These codes are not included in CDC Vaccine Code Set files at this time."[12]

---

[11] Exhibit 22, Declaration of TSgt Tyler J. Whitney dtd 2 Dec 2021 (emphasis added).
[12] https://www.cdc.gov/vaccines/programs/iis/covid-19-related-codes.html, last accessed Dec. 5, 2021. This is also pointed out in the Amicus brief of Pritish Vora, on p. 4. Defendants' online repositories show the product spelled two different ways – Comirnaty and Cominarty.

16.     The National Drug Code (NDC) is the number that identifies a drug. It is assigned by the Defendant FDA to every drug and there is an online searchable database for every available product. Comirnaty has no NDC because – again – it cannot. It is the same reason that TSgt Whitney cannot order that product through the military's vaccine system. It is why many of the other Exhibits show that the military has no method for even differentiating between Comirnaty and BNT162b2.

17.     All of these sources together show a single point of consilience: there is no licensed Comirnaty product *available* because there legally can't be – or the Defendant FDA's issuance of the EUA for BNT162b2 was in direct contravention to the governing EUA statute. This also explains why the current absurd and logically impossible situation noted *infra* at ¶¶2-3 exists – the EUA statute is designed so that experimental products *cannot be mandated* when there is a licensed product available to the public. It is only the FDA's attempted end-run of its own statutory obligations – by attempting to compel an experimental product – is why SSgt Long is facing administrative discharge simply for having asked to receive a licensed product.

18.     Emergency Use Authorizations for biologic products are not supposed to be handed out freely like Halloween candy because the standards for using an EUA are so much lower than those of a fully-licensed product. The EUA statute only requires that the Secretary find "it is reasonable to believe that the product <u>may</u> be effective in diagnosing, treating, or preventing such disease or condition…" 21 U.S.C. Sec. 360bbb-3(c)(2)(A). That's it – "may be" effective. The Secretary also has to make a risk-benefit analysis based upon what is known at the time. Contrasted with the requirements for a fully-licensed product, including finished, controlled clinical trials, notice and comment provisions to allow the public to weigh-in, requirements to demonstrate "safety and efficacy," as well as "stability, sterility, potency," etc.

and it becomes obvious why an EUA *cannot ever* be used when there is an existing licensed product for the same condition.

19.    To finish the analysis of <u>Doe v. Austin</u>, Plaintiffs note that the judge there also partly-based his decision on one portion of the statute that indicates that anyone being administered an EUA also must be informed of "alternatives" and he therefore concluded that the statute could not be "binary" with respect to availability because of the provision regarding the Secretary's requirement to advise people "of the alternatives to the product that are available, and of their benefits and risks..." 21 U.S.C. Sec. 360bbb-3(e)(1)(A)(3). What the judge misses is that there are frequently other products that are licensed for *different conditions* ("indications" in medical- or FDA-speak) that offer some potential benefit in treating the condition, but would be considered an "off-label" use. In the case of COVID-19, for example, a number of products exist that are licensed for other indications, but have a much longer safety record than the mRNA shots are "alternative" possible treatments to an EUA with no long-term safety profile. Ivermectin – an anti-malarial drug that has been licensed since 1981 as an anti-parasitic, is one such example. The court's interpretation of this provision entirely ignores the plain, inescapable language of the statute regarding "availability," as well as the Defendant FDA's own admissions on this subject in its regulatory letter. Therefore, the judge's analysis fails because it goes beyond mere deference and rewrites the statute and discards the obvious facts.

20.    Exhibit 23 is an Inspector General complaint from LTC Matthew Curtin, USAF, that identifies the exact issue for this court to resolve – the alleged "interchangeability" of the unlicensed EUA product (BNT162b2) for the licensed product (Comirnaty). LTC Curtin asks the Air Force IG to address the distinction between the two shots and how that impacts the legality of the order to take an unlicensed product in light of 10 U.S.C. §1107a. Of note is that on 10 Nov

2021, the IG punts by citing to the Air Force's Civil Litigation division answer of 15 Oct 2021. That answer consists of "No Comment" in light of ongoing litigation, including the *Doe v. Austin* case. Just 2 days later, on 12 Nov 2021, however, the judge in *Doe v. Austin* unequivocally answered that question in LTC Curtin's favor. "The DOD acknowledges that the President has not executed a wavier under this section… so as things now stand, the DOD cannot mandate vaccines that only have an EUA. 10 U.S.C. § 1107a(a)(1)." Yet the Defendant DoD continues to administer EUA products in violation of both a Congressional statute AND a federal judge's clear finding that prohibits them from using EUA products on members of the military.

21.     The only remaining issue for the Court is whether the Defendant FDA or DoD can legally "substitute" an EUA product in lieu of an FDA-licensed one if it is dubbed "chemically similar enough" – or whatever other language the Defendant FDA has now switched to in light of the problem of using the word "interchangeable."

22.     The simple answer is No, they cannot. As noted in Plaintiffs original PI motion, "interchangeability" is a specifically defined term under the Public Health Service Act. The Defendant FDA's 23 Aug 2021 letters regarding Comirnaty and BioNTech are the Defendant FDA speaking *ex officio*. Those letters are interlocking, lengthy, and undoubtedly the of hours of work product of a number of lawyers and FDA officials. It simply cannot be that the Defendants are entitled to judicial deference because of their expertise, and then when they use a specific term of art from their own statute incorrectly that the courts pave over it and say the "experts" were using this critical term in its more "common" meaning. One of the first logical fallacies that beginning law students learn is *equivocation* - the use of a single word with two different meanings in the same argument. This is also why first year law students learn to have *elegant variation* flensed from their legal writing. While agencies may be due deference, the courts are

not there to rubber-stamp obviously incorrect statements, findings, or decisions. Otherwise, APA review is meaningless and pointless. Federal administrative agencies are required to engage in reasoned decision-making. <u>Allentown Mack Sales & Serv., Inc. v. N.L.R.B.</u>, 522 U.S. 359, 374 (1998). If an administrative agency does not engage in reasoned decision making, a court, under the APA, "shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

23.     The Defendant FDA undoubtedly spent significant hours to construct those interlocking regulatory approval and EUA letters for both Comirnaty and BioNTech. Those official documents cannot be reconciled by pretending that the Defendants were just speaking *ex cathedra* when using a term of such significance as "interchangeability" for two biologic products. This is the Defendant FDA's area of expertise. Did they simply forget about their regulation of biologics? And accidentally picked a word that happens to also be a term of art in their own statute on the regulation of biologics – the exact product that is under discussion? It beggars belief to suggest that this was a mistake, particularly not when the next day the Defendant DOD issued its order, and then the Assistant Secretary of Defense explicitly relied upon *this exact word* in order to compel an EUA product on members of the Armed Forces just a few weeks later.

> Per FDA guidance, these two vaccines are "interchangeable" and DoD health care providers should "use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine."[13]

24.     The terms of the EUA statute itself and 10 U.S.C. §1107a prohibit Defendant

---

[13] Memorandum of Acting Sec. of Def. for Health Affairs Terry Adirim, Exh. 15 to Amended Compl., ECF #29.

FDA from switching out a licensed product in favor of a "chemically similar" unlicensed product for what should be obvious reasons. Defendants go to the trouble of misstating Plaintiffs' legal position by claiming Plaintiffs do not challenge that these two products are "medically interchangeable" in their response.[14] In addition, the New England Journal of Medicine has published on this exact point and Defendants are undoubtedly aware of this study – because it's regarding the ongoing experiment for the licensure of BNT162b2. The NEJM makes an explicit comparison of BioNTech BNT-162b1 v. BNT162b2 and notes that despite their similarity, they are NOT identical. The comparison makes clear what Plaintiffs have alleged in their complaint and in their PI Motion: that even these "chemically similar" products are *different* and produce *different effects* when injected into the human body.[15]

> The reason for the lower reactogenicity of BNT162b2 than of BNT162b1 *is not certain*, given that the two vaccine candidates share the same modRNA platform, RNA production and purification processes, and formulation of lipid nanoparticles. **They differ** <u>in the nucleotide sequences that encode the vaccine antigens and in the overall size of the RNA constructs</u>, which results in a number of RNA molecules in 30 μg of BNT162b1 that is approximately 5 times as high as that in 30 μg of BNT162b2. The nucleotide composition of RNA has been reported to affect its immune stimulatory activity and reactogenicity profile, and this is a possible explanation for the differences in these vaccine candidates.[16]

      25.    Defendants making claims about safety or efficacy of a biologic during an ongoing trial is itself an *abuse of discretion*. As Plaintiffs have already shown, the clinical trial/medical experiment is still ongoing. It is not possible, nor permissible, for the Defendant

---

[14] Plaintiffs' PI Motion at ¶28, explicitly states that "there are scientific, manufacturing, and *legal differences* between the Pfizer-BioNTech COVID-19 (BNT) shot and the newly approved COMIRNATY COVID-19 Vaccine, mRNA." ECF Dkt. 30, at ¶28.

[15] <u>See</u> "Safety and Immunogenicity of Two RNA-Based Covid-19 Vaccine Candidates," N. Engl. J. Med. 2020; 383:2439-50. https://www.nejm.org/doi/full/10.1056/NEJMoa2027906

[16] <u>Id.</u>, at 2449 (emphasis added).

FDA to opine on "safety and efficacy" – legal requirements (and terms of art under the FD&C) for licensure of a product – while the experiment still has *more than 18 months left to go*. This would be like a graduate student in chemistry lab proclaiming that the outcome of the experiment was already known only 20 minutes after the lab had started. It means that the either the student is cheating or the entire undertaking is pointless – because if the result is already known, then it's not really an experiment at all. Defendant FDA making such proclamations is irresponsible and reckless in the extreme. What if additional members of the experiment start to die, or show delayed adverse effects? An early claim of "efficacy" and "safety" commits the Agency to a position that may be later contradicted by the data – and could be the cause of interpreting data in a way that buttresses early claims rather than following the evidence where it leads. These words are words of legal import under Defendant FDA's rules and statutes; here again Defendant FDA uses its own terms in an equivocal fashion before the critical, prerequisite experiment is even completed.

26.     Defendants also spend time invoking George Washington's vaccination of his troops against smallpox in support of this illegal endeavor. This is in vain, however, because as Plaintiffs have maintained from the beginning of this action, these Covid-19 therapeutics are decidedly NOT vaccines. They meet none of the requirements to be defined as vaccines other than the route of administration – i.e. being a shot in one's arm. These are entirely novel biologics that contain not one whit of a live or attenuated virus, do not prevent infection from Covid-19, do not prevent transmission of the virus, and – up until the Defendant FDA's pseudo-licensing of Comirnaty – no mRNA shot has ever passed Defendant FDA's rigorous process to be a licensed biologic. And, if our first President wanted the troops to take such a product, he undoubtedly would have complied with the Congressionally mandated procedure for doing so

and signed the requisite waiver.

27.     While the President may be the Commander-in-Chief of the Armed Forces, Congress is given the explicit responsibility and authority to "declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water; To raise and support Armies… To provide and maintain a Navy; [and] *To make Rules for the Government and Regulation of the land and naval Forces*[.]" U.S. Const. Art. I - Sec. 8 (emphasis added). Congress' actions in enacting the EUA statute and the specifically imposed limitations on use of unlicensed biologics at 10 U.S.C. §1107a are within its plenary power to regulate drugs in commerce and the military. The Executive is bound to follow them, not find creative loopholes and sophistry to avoid them. Courts are also bound to enforce them and to protect the rights of our citizen-soldiers no less than any other citizen.

28.     The penultimate issue Plaintiffs submit for consideration by this Court is *Doe v. Rumsfeld*'s four-part litigation in the D.C. District Court. The Defendants' Response brief cites this litigation and claims that it does not apply because it only concerned "investigational new drugs or drugs unapproved for their applied use." Def. Brf., at 19-20. This is incorrect. While the case initially dealt with the anthrax vaccine while it was in an investigational new drugs status, by the time the Defendant DoD and FDA had lost on appeal, and the case had come back down to the district court, the EUA statute – 21 U.S.C. §360bbb-3 – had been passed. Indeed, the Defendants' actions in that case show exactly why the current mandate is illegal and their actions here constitute an abuse of discretion.

29.     The first vaccine that Defendant FDA ever granted EUA status to was the anthrax vaccine in 2005 – and it is directly relevant because in that prior case, both the Defendants DoD and FDA took the exact *opposite* legal position on the record than that which they are taking

15

right now. As the Fifth Circuit recently noted in issuing a Preliminary Injunction against the OSHA vaccine mandate:

> Because it is generally "arbitrary or capricious" to "depart from a prior policy *sub silentio*," agencies must typically provide a "detailed explanation" for contradicting a prior policy, particularly when the "prior policy has engendered serious reliance interests." OSHA's reversal here strains credulity, as does its pretextual basis. Such shortcomings are all hallmarks of unlawful agency actions.[17]

30.    After the D.C. District Court enjoined the Defendant DoD's anthrax vaccine program in 2003[18], the defendant DoD and FDA both took various actions to continue Secretary Cohen's 1998 anthrax vaccine mandate. *See* Doe v. Rumsfeld, 341 F.Supp.2d 1 (D.D.C. 2004). After being enjoined again, and facing a permanent injunction, the Defendant DoD filed an emergency motion with that court to Modify the Injunction because Defendant FDA had reclassified the anthrax vaccine as an EUA product – the first time any vaccine had ever been granted that status.

> Defendants have now filed an Emergency Motion to Modify the Injunction, seeking clarification that there exists a third option - an alternative to informed consent or a Presidential waiver - by which defendants can administer AVA to service members even in the absence of FDA approval of the drug: that is, pursuant to an Emergency Use Authorization ("EUA") under the Project BioShield Act of 2004, 21 U.S.C.A. § 360bbb-3."[19]

31.    The FDA placed several conditions on granting the EUA, but only one is important to this litigation. Noting that 21 USC 360bbb-3(e)(1)(A)(ii)(III) contains not only an informed consent requirement, but also a requirement that individuals to whom the product is administered be informed of the option to accept or refuse administration of the product, the

---

[17] BST Holdings, LLC v. OSHA, No. 21-60845, p. 12 (5th Cir. 2021)(citations omitted)(emphasis added).
[18] 297 F. Supp. 2d 119 (D.D.C. 2003)
[19] The *Doe v. Rumsfeld* order is attached as Exhibit 24.

FDA determined that an option to refuse vaccination meant that DOD's AVIP could not be

mandatory, and that there could be no disciplinary or other punitive measures taken against

service members, civilian employees, or civilian contractors who refused the shot.

> With respect to condition (3), above, relating to the option to accept or refuse administration of AVA, the AVIP will be revised to give personnel the option to refuse vaccination. Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice. Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation based on refusal of anthrax vaccination. *There may be no penalty or loss of entitlement for refusing anthrax vaccination.*

70 Fed Reg. 5452, 5455 (Feb.2, 2005)(emphasis added).

32. In other words, in circumstances virtually identical to those presented here, the

FDA determined that the statutory requirement of an option to refuse a mandatory EUA

vaccination meant that there can be no punitive action against someone who does not want the

shot. This requirement applied to both military members and civilian employees and contractors,

all of whom were subject to the anthrax vaccination program in its original form.

33. The Doe v. Rumsfeld series of decisions is, therefore, directly relevant on

multiple levels: (1) it has obvious factual relevance because it involved injunctive relief by

servicememembers against a mandatory vaccination program; (2) because it was the first vaccine

ever granted EUA status by the FDA; (3) because both the Defendants FDA and DoD took

public, official positions exact contrary on the same legal issue in the instant case – whether or

not servicemembers could refuse an EUA product without penalty – and is therefore relevant to

whether or not the agency has abused its discretion record; and finally (4) because as Supreme

Court precedent notes, the courts must consider the "reliance interests" that attended a prior

policy.

34.     This comes into concrete focus throughout the exhibits attached to this Reply, but particularly in Exhibit 25. Commander J. H. Furman explicitly relies upon the Doe v. Rumsfeld decision. This is no accident – while the decision may have been ignored by the broader public, it had a huge impact inside the military. For someone of CDR Furman's rank and time in service, it is likely he watched the anthrax program debacle first-hand. It was only 15 years ago, well within a "generation" of 20-year officers and enlisted members. Shouldn't CDR Furman – and the members of the Armed Forces more broadly – be able to rely upon the courts to consistently apply the federal statutes regarding the administration of unlicensed products to the military? The other exhibits reflect these same concerns about this same issue. This is because military members are neither stupid, nor uninformed, and as a matter of obligation are duty-bound to disobey illegal orders.

35.     The Defendants spend significant time in their Response trying to overturn decades of the science – and experience – of basic virology and immunology on the issue of natural immunity. The recent Louisiana federal district court decision enjoining the vaccine mandate for healthcare workers found that the executive agencies'

> …rejection of natural immunity as an alternative is puzzling. Natural immunity is the immunity of people who have been infected with the COVID-19 virus. In rejecting this alternative, the CMS Mandate stated: While a significant number of healthcare staff have been infected with SARS-Co-V2, evidence indicates their infection-induced immunity, also called "natural immunity" is not equivalent to receiving the COVID-19 vaccine. 86 Fed. Reg. at 61559. The "evidence" CMS relied upon in rejecting that alternative is not provided.[20]

36.     The court there also asks perhaps the most salient question of all on this issue – "the CDC recently recommended boosters. If boosters are needed six months after being 'fully

---

[20] *Louisiana et al v. Becerra, et al.*, 3:21-cv-03970, Memo. Order, Dkt 28, p. 25

vaccinated,' then how good are the COVID-19 vaccines, and why is it necessary to mandate them?"[21] To ask the question is to have it answered. The evidence shows – and the CDC admits on its own website – that the "fully vaccinated" are not protected from infection and that they can spread the disease just like the unvaccinated. As the Amicus Brief notes, even using the Defendants' own numbers, the risk to this population is effectively zero. The Defendants' insistence on an unlicensed, experimental vaccine for the unusually young and heathy military population, and even moreso for those with 'natural immunity,' raises questions about what exactly is driving the mandate.

37.     Further to this, Plaintiffs ask the Court to consider that currently all of President Biden's vaccine mandates – for federal contractors under the Procurement Act, for employers with more than 100 employees under the OSHA statute, healthcare workers under the Medicare/Medicaid statute – have all been stayed by various federal district or Circuit courts because of the vast overreach and obvious lack of precedent for the claimed authority by the President. Several of the courts have noted that the executive agency actions have a strong appearance of being pretextual. This military mandate is of the exact same character – there is no military or national security component to these actions. It is purely (yet another) public health mandate masquerading under the rubric of "Force protection." Only 17 days separate this mandate from the President's Sept. 9, 2021, remarks that began all of the other mandates that are now enjoined.

38.     The last point of consideration for this Court on the issue of the equities and balance of interests. The total force of the military is about 2MM members out of roughly 340MM total population of the United States. That means that about 1/170, or about .6%, of the

---

[21] Id.

[image not meaningful]

entire population *volunteers* to defend this Nation. At some point, a court is going to need to consider in its balancing of equities how much longer the U.S. will be able to continue to recruit fit, able, patriotic young men and women to defend this nation at the tip of the spear if forcible experimentation with unlicensed biologics is now part of the calculus for joining. How many volunteers will be left after the many people like the Plaintiff, and others with legitimate religious objections are thrown out, harassed, indebted to the DoD, and castigated simply for asking that they be given a product that has actually completed its requisite clinical trial before being plunged into their bodies? No one signs up to be experimented upon – that has never been a part of the bargain for serving.

39.    Plaintiffs have demonstrated a substantial likelihood of success on the merits, irreparable injury by being forced to take a product that is unlicensed, that the balance is of interests weighs in their favor, and that an injunction is not adverse to public interest – rather it is decidedly in the public interest to so grant.

Wherefore, Plaintiffs respectfully pray for the following relief:

a. An Order to all Defendants to stop inoculation of Plaintiffs and those similarly situated to them with any unlicensed biologic products;

b. An order requiring Defendant DOD to comply with its own publication, AR 40-562, and ensure that individual service members with preexisting COVID-19 exposure for serological immunity are given an exemption under Defendant DoD's regulations;

c. An order prohibiting Defendants from retaliating against or in any other way professionally damaging Plaintiffs, and any other service member objecting to inoculation with the Pfizer-BioNTech EUA product; and

d.  For any other additional relief as this court deems equitable and proper.

Dated this 7th day of December, 2021.

Respectfully submitted,

_/s/ Dale Saran_____
Dale Saran, Esq.
MAJ, USMCR (Ret).
dalesaran@gmail.com
19744 W. 116th Terrace
Olathe, KS 66061
(480)-466-0369
Attorney for Plaintiffs

_/S/ Todd Callender_____
Todd S. Callender, Esq.
Colorado Bar #25981
Disabled Rights Advocates PLLC
600 17th St., Suite 2800
Denver, CO 80202
(303) 228 7065, Ext. 7068
todd@dradvocates.com
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on Dec. 7th, 2021, I electronically filed the above-captioned Reply and

Exhibits with the Clerk of Court using the CM/ECF system.

 /s/ *Todd S. Callender*
Todd Callender, Esq.
Colorado Bar #25981
600 17th St., Suite 2800
South Denver, CO 80202
Telephone: (720) 704-7929
Email: todd@dradvocates.com
Attorney for the Plaintiffs

 /s/ *Dale Saran*
Dale Saran, Esq.
MA Bar #654781
19744 W 116th Terrace
Olathe, KS 66061
dalesaran@gmail.com
Telephone: 480-466-0369
Attorney for the Plaintiffs